# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | Case No. 2:24-MJ-03980 |
| The Person Boris Castro | ) | |

## AMENDED APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 371 | Conspiracy |
| 42 U.S.C. Section 6928(d)(2)(A) | Treatment, storage, or disposal of a hazardous waste |
| 42 U.S.C. Section 6928(d)(5) | Transportation of a hazardous waste without a manifest |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

/s/ Special Agent Greg Bazley, U.S. EPA
_____
*Applicant's signature*

Special Agent Greg Bazley, U.S. EPA
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA

Hon. Steve Kim, U.S. Magistrate Judge
_____
*Printed Name and Title*

AUSA: Dennis Mitchell, Ext. 2484

## ATTACHMENT A-1

PERSON TO BE SEARCHED

The Person of Boris Castro, further described as a white male, approximately 5'7" tall, weighing 165 pounds, and California Driver's License Y2351811. Below is a picture from his California Driver's License.



The search of the aforementioned person shall include all digital devices, clothing, and personal belongings including backpacks, wallets, briefcases, and bags that are within Boris Castro's immediate vicinity and control.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 42 U.S.C § 6928(d)(2)(A) (treatment, storage, or disposal of a hazardous waste without a permit), and 42 U.S.C § 6928(d)(5) (transportation of a hazardous waste without a manifest) for the period from November 4, 2022, up to and including the date of issuance of this warrant, and are limited to records, information, materials, electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, images, audio files, videos, and location data:

      a.    tending to indicate effort to transport and/or dispose of hazardous waste;

      b.    containing images of hazardous waste;

      c.    tending to indicate contact with individuals regarding the location(s) at which the hazardous waste might be located, transported, or disposed of;

      d.    tending to identify electronic media accounts-such as email addresses, IP addresses, social media accounts and phone numbers used to facilitate the transport and/or disposal of hazardous waste;

      e.    tending to identify co-conspirators, criminal associates or others involved in transporting and/or disposing of hazardous waste;

iii

f.   tending to identify travel to of presence at locations involved in transporting and/or disposing of hazardous waste;

g.   tending to identify proceeds and/or payments associated with the transport and/or disposal of hazardous waste;

h.   tending to identify information regarding the legal requirements applicable to the transport and/or disposal of hazardous waste;

i.   tending to indicate permits and official authorization to transport, treat or dispose of hazardous waste;

j.   tending to identify the user of, or persons with control over or access to, the telephone; and

k.   tending to place in context, identify the creator or receipt of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

2.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof. The term "digital device" includes the cell phone belonging to CASTRO known to be a Samsung Galaxy, associated with phone number 213-924-4420.

3.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g.    records of or information that Internet Protocol addresses use by the device.

4.    As used herein, the terms "records," "information," "documents," "programs," "application," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location. The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant. The United
States will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all the data
contained in each digital device capable of containing any of
the items to be seized to the search protocols to determine
whether the device and any data thereon falls within the scope
of items to be seized. The search team may also search for and
attempt to recover deleted, "hidden," or encrypted data to
determine, under the search protocols, whether the data falls
within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the United States will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the United States may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the United States may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The United States may also retain a digital device if the United States, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the United States has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the United States shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The review of the electronic data obtained under this warrant may be conducted by any United States personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the United States, attorney support staff, and technical experts. Under this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the United States and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress CASTRO's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CASTRO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain

access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
under the authority conferred by this warrant and do not apply
to any search of digital devices under any other court order.

## <u>AFFIDAVIT</u>

I, Gregory Bazley, being duly sworn, declare and state as
follows:

### I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the U.S.
Environmental Protection Agency ("EPA") – Criminal Investigation
Division ("CID") and have been so employed since September 2022.
I am currently assigned to the EPA-CID Los Angeles Resident
Office.  I have a bachelor's degree in Biochemistry from Ohio
University. I have completed training at the Federal Law
Enforcement Training Center in Glynco, Georgia, which included
the Criminal Investigator Training Program, the EPA-CID
Environmental Investigation Basic Training Program, and Advanced
Interviewing for Law Enforcement Investigators Training Program.

2.   As a federal agent, I am authorized to investigate
criminal violations of federal environmental statutes, and
violations under Title 18 of the United States Code ("U.S.C.").
Pursuant to 18 U.S.C. § 3063, Special Agents of EPA-CID are
authorized to apply for and serve search warrants. I have
participated in the execution of numerous search warrants
involving violations of federal environmental statutes.

### II. <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of a search warrant
for the person of Boris Castro ("CASTRO"), further described in
Attachment A-1, for the things described in Attachment B, which
are the evidence, fruits, and instrumentalities of violations of
18 U.S.C § 371 (conspiracy), 42 U.S.C § 6928(d)(2)(A)

(treatment, storage, or disposal of a hazardous waste without a permit), and 42 U.S.C § 6928(d)(5) (transportation of a hazardous waste without a manifest). Additionally, I make this affidavit in support of an application for a warrant for the following digital device (the "SUBJECT DEVICE"), believed to be in the possession of CASTRO further described in Attachment A-2:

    a.   A Samsung Galaxy cellular phone with an IMEI of 357111206168928, SIM number 8901260235784458612, and with associated phone number (213) 924-4420 believed to be in the possession of CASTRO, (the "SUBJECT DEVICE").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement personnel, witnesses, and others . This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. THE RESOURCE CONSERVATION AND RECOVERY ACT

On October 21, 1976, Congress passed the Resource Conservation and Recovery Act ("RCRA") as the primary law governing the disposal of solid and hazardous waste. Pursuant to RCRA, hazardous wastes are those solid wastes either listed because of specific constituents or characteristic for established levels of toxicity, ignitability, corrosivity, or reactivity.

5.   RCRA established the hazardous waste program to reduce

the amount of waste generated and protect human health and the environment from the potential hazards of waste disposal. RCRA Subtitle C, 42 U.S.C. § 6921 et seq., establishes a system for controlling hazardous waste from the time it is generated until its ultimate disposal – in effect, a "cradle to grave" approach to hazardous waste management that exists today.

6.   RCRA Subtitle C empowers the EPA to identify and list hazardous wastes. It also authorizes EPA to regulate hazardous waste generators, transporters, and the owners and operators of hazardous waste treatment, storage, and disposal facilities.

7.   RCRA provides that States may be authorized to administer and enforce hazardous waste management programs in lieu of the federal program.  42 U.S.C. § 6926.  The State of California received final authorization to administer and enforce a hazardous waste program effective August 1, 1992.  California's regulations pertaining to RCRA's hazardous waste definition and management are set forth at Title 22, California Code of Regulations ("C.C.R."), § 66261 et seq.  In California, the hazardous waste program is managed by the California Department of Toxic Substances Control ("DTSC").

8.   Under 42 U.S.C. § 261.33, Nicotine is listed under Hazardous Waste Number P075.

Disposal

9.   Disposal is defined as the discharge, deposit, injection, dumping, spilling, leaking, or placing of hazardous

3

waste into or on any land or water so that such waste or any
constituent thereof may enter the environment or be emitted into
the air or discharged into any waters, including ground waters.
42 U.S.C. § 6903  40 C.F.R. § 260.10; 22 C.C.R. § 66260.10. Any
person who treats, stores, or disposes of hazardous waste must
have a permit or interim status.

10.  42 U.S.C. § 6928(d)(4), makes it a crime for any
person to knowingly generate, store, treat, transport, dispose
of, export, or otherwise handle any hazardous waste and to
knowingly destroy, alter, conceal, or fail to file any record,
application, manifest, report or other document required to be
maintained or filed for purposes of compliance with regulations
promulgated by the Administrator or by a State in the case of
authorized State program.

11.  The transportation of hazardous waste for disposal
generally requires the use of a hazardous waste manifest,
pursuant to Title 42, United States Code, Section 6928(d)(5),
which is intended to track the waste from cradle to grave. A
hazardous waste manifest is required to be prepared by the
generator of the waste. It is a form, with several copies, which
describes the nature and quantity of the waste (including the
EPA waste code), and identifies the generator, the transporter,
and the disposal facility.

12.  When the generator provides the waste to the
transporter for disposal, the transporter signs the manifest,
and provides a copy to the generator. When the transporter
provides the waste to the disposal facility, the disposal
facility signs the manifest and provides a copy to the

4

transporter. When the waste is finally disposed of, the disposal company provides a copy to the generator, confirming the waste has been handled properly. A copy is also sent by the disposal company to the State of California, which maintains a database of such records.

<u>Without a Permit</u>

13.   The  regulations define a hazardous waste as a solid waste that exhibits one of four characteristics of a hazardous waste or one which appears on a list of hazardous wastes found in the regulations. 40 C.F.R. 261.3(a)(2), 22. C.C.R. § 66261.3(a)(2).

14.   The treatment, storage, or disposal of hazardous waste "without a permit" occurs when a person handling hazardous waste does not have a permit issued by EPA or an authorized state.

15.   California Code of Regulations, Title 22 § 66270.1 requires a facility that treats, stores, or disposes of hazardous waste to obtain a permit.

16.   42 U.S.C. § 6928(d)(2)(A), makes it a crime for any person to knowingly treat, store, or dispose of any hazardous waste identified or listed without a permit.

### IV. <u>SUMMARY OF PROBABLE CAUSE</u>

17.   On November 4, 2022, a warehouse containing a large collection of electronic cigarettes burned down. Electronic cigarettes contain nicotine, which is listed as a material that is hazardous waste if and when discarded or intended to be discarded, under 42 U.S.C. § 261.33, 22 C.C.R. § 66261.33.  Due to the presence of the nicotine, a hazardous substance, an EPA federal on-scene coordinator ("OSC") was designated to manage

the clean-up process. Further, the owners and tenants at the location were sent a Notice of Federal Response Action ("NFRA") informing them that removal of materials from The Site is prohibited, unless conducted pursuant to the notice and under the direction of the OSC.

18.   According to Ed Acosta, Project Manager of Ocean Blue Environmental Services Inc. ("Ocean Blue"), Faraz Youssefian, brother of property owner Payam Youssefian, hired Ocean Blue, a company certified to handle and transport hazardous waste to conduct the clean-up. Ocean Blue, in turn, hired a subcontractor, Hartfield Construction Corporation ("Hartfield Construction"), to assist in the clean-up effort.

19.   On Saturday, June 10, 2023, a Hartfield Construction employee traveled to The Site and saw a white box truck containing full garbage bags at the location.  He also observed that the debris pile containing damaged e-cigarettes had been disturbed in a manner consistent with removing vape pens.

20.   Special agents spoke to Apolinario Pelico Elias ("ELIAS"), to whom the box truck was registered. ELIAS, who describes himself as a handyman, does not have the required certificates needed to transport hazardous waste. ELIAS told special agents that CASTRO had hired him to remove materials from The Site.

21.   Security camera footage from a nearby business showed men loading items from The Site into ELIAS's box truck on several occasions in May and June 2023, followed by the box truck departing the location. Security footage also shows CASTRO meeting with the men loading the box truck, and separately, with

The Site's owner, YOUSSEFIAN, and tenant, KUMAR. Telephone records also show communications between ELIAS and the SUBJECT DEVICE, which is registered to CASTRO.

22.   Based on this information, and other information described below, I believe CASTRO was involved in hiring ELIAS to facilitate the transportation of a hazardous substance (nicotine) without a permit or manifest, and in violation of federal criminal law.

## V.  STATEMENT OF PROBABLE CAUSE

23.   Based on my review of law enforcement reports, conversations with other law enforcement agents and government employees, my review of a video recording of surveillance footage, and my own knowledge of the investigation, I am aware of the following:

24.   On June 12, 2023, I received an email from an EPA Federal On-Scene Coordinator ("OSC"), with information that hazardous waste was illegally removed from an EPA cleanup site located in Los Angeles, California. An EPA Federal OSC is a federal official responsible for monitoring and directing responses to all oil spills and hazardous substance releases reported to the federal government.

25.   I know from communications with the OSC that the site, located at 3125 East 12th Street in Los Angeles, California, ("the 12th Street Fire Site" or "The Site") was a warehouse that burned down in November 2022. Several news outlets in Los Angeles covered the story at the time the fire occurred.

26.   In addition to speaking to the OSC, I reviewed a Notice of Federal Response Action ("NFRA") concerning the 12th

7

Street Fire Site. Based on my training and experience, I know that a NFRA is letter sent by EPA to potentially responsible parties after a release of hazardous substances. I reviewed the NFRA, which was issued to Payam YOUSSEFIAN in his capacity as the owner of The Site, as well as Kapil KUMAR, and Sanad MUSTAFA, in their capacity as tenants of The Site. The NFRA expressed EPA's intended involvement in a response action at The Site and included the following language: "Removal of materials from the site is prohibited unless conducted per the direction in this Notice, and under the oversight of the OSC."

27.   I also reviewed a General Notice Letter ("GNL") sent to YOUSSEFIAN, KUMAR, and MUSTAFA from EPA's Emergency Response, Planning & Preparedness Branch Superfund & Emergency Management Division of the EPA, notifying the listed parties of their potential responsibility for clean up at The Site. According to the letter, on November 4, 2022, a fire occurred at The Site. The building at The Site contained e-cigarettes and their raw components, including an estimated 7,500,000 small lithium-ion batteries used to power e-cigarettes and up to 4,000 gallons of USP-grade nicotine. A considerable quantity of water runoff emerged from the building debris and flowed into a nearby storm drain. Los Angeles County Fire Department Hazardous Materials Division requested assistance from EPA in the cleanup response.

28.   Based on my review of case documents, including a communication from the OSC, the warehouse stored approximately over one million e-cigarettes which contained nicotine. Water runoff sampling performed by EPA contractors confirmed the presence of nicotine.  The majority of the vape pens were

damaged or destroyed in the warehouse fire, as observed from pictures and accounts from contractors cleaning up The Site.

29.   Based on my review of investigative materials, a cleanup effort began after the fire occurred. Ocean Blue Environmental Services Inc. ("Ocean Blue") was hired as a contractor to conduct the clean-up effort, which was overseen by EPA. According to Ed Acosta, Project Manager of Ocean Blue, Faraz Youssefian, brother of property owner Payam Youssefian, hired Ocean Blue to clean up waste from the fire.  Ocean Blue also hired a subcontractor, Hartfield Construction Corporation ("Hartfield Construction"), to assist in the clean-up effort. As part of that clean-up effort, hazardous materials, including the damaged e-cigarettes were congregated into a pile, segregated, and sorted at The Site for proper disposal of hazardous waste.

30.   Ocean Blue is qualified to handle and transport hazardous waste as they provided Hazardous Waste Operations and Emergency Response (HAZWOPER) certifications and are registered in the California's Department of Toxic Substances Control ("DTSC") database of Registered Hazardous Waste Transporters.

31.   Based on my background, training and experience, nicotine is an acutely toxic substance and a listed hazardous waste under RCRA. Because of its status as a listed hazardous waste under RCRA, a state issued permit is required to lawfully transport and dispose the waste and a manifest must be generated and utilized in its transport and disposal.

32.   On Saturday, June 10, 2023, an employee from Hartfield Construction traveled to the 12th Street Fire Site to

pick up a piece of equipment when he observed an unknown white Isuzu box truck ("box truck") inside the gate at The Site. He observed that the box truck contained black garbage bags and photographed the bags, as pictured below.



33.   The employee from Hartfield Construction also observed that the hazardous waste pile, which included hazardous waste e-cigarettes, had been disturbed and boxes of garbage bags were on the ground nearby. The employee described how the edge of the hazardous waste pile had a vertical slope, like it had been shoveled, rather than the way he left it. The employee recounted that he had used heavy equipment to move portions of the hazardous waste pile. He also photographed the boxes of garbage

bags near the hazardous waste pile as pictured below. After taking the photographs he sent them to management at Ocean Blue.



34.   Based on the California license plate, the box truck was registered to APOLINARIO PELICO ELIAS ("ELIAS"). Ed Acosta, Project Manager of Ocean Blue confirmed that ELIAS was never hired by Ocean Blue to perform work at The Site.

35.   In an interview with EPA Special Agents conducted on March  14, 2024,[1] ELIAS described himself as a handyman that performs jobs such as garbage and trash removal.

36.   Based on conversations with ELIAS and searches of California's DTSC database of Registered Hazardous Waste Transporters, ELIAS does not maintain any appropriate certifications to transport hazardous waste.

37.   In an interview ELIAS stated he never saw vape pens

---

[1] In the affidavit in this matter submitted on July 3, 2024, I inadvertently and incorrectly stated that the date of the interview was May 14, 2024.

11

being removed from the warehouse. He stated he just saw pure trash and metal and he didn't pay attention to what was in the trash he was removing. ELIAS was not familiar with e-cigarettes. When a Special Agent described e-cigarettes during an interview, ELIAS stated, as translated to English, "Yes, well there they would say that it was - ah, what's it called - all things to - like to smoke… cigars. It's what they would say." ELIAS claimed that he did not know where they were taking the material because he was not the person physically driving the truck, and named another individual working with him as the person who drove it.

38.  In an interview with special agents, Elias identified CASTRO as the person that hired him to remove materials from the 12th Street Fire Site.

39.  ELIAS stated that CASTRO paid workers in cash.

40.  ELIAS also stated that CASTRO instructed him not to speak with law enforcement.

41.  On June 14, 2023, I traveled to the vicinity of the 12th Steet Fire Site. I observed security cameras on the exterior of a building across from the 12th Street Fire Site entrance gate. The security cameras belonged to a business known as FlexHQ.

42.  I received consent to review and retrieve security video footage from a manager at FlexHQ.

43.  A review of video footage showed the white Isuzu box truck at The Site on June 10, 2023. Additionally, the box truck was observed at the 12th Street Fire Site on June 9, 2023; May 28, 2023; and May 27, 2023. The video footage shows men loading

the box truck, and the box truck departing The Site, and often returning approximately thirty minutes later.

44.  The video footage showed CASTRO meeting with the men that loaded the box truck. The video footage also showed CASTRO meeting with the property owner, YOUSSEFIAN, and the tenant, KUMAR.

45.  On the evening of June 9, 2023, CASTRO was observed in video footage carrying boxes of garbage bags from his vehicle into The Site.



46.  CASTRO's employment records affiliate him with KUMAR, the tenant at 12th Street Fire Site, through the company Blackbird Distribution, LLC.

47.  Special agents obtained call detail records though a subpoena to T-Mobile for the cellular telephones of both ELIAS and CASTRO. Per the records, CASTRO's phone is a Samsung Galaxy associated with phone number (213)924-4420. The subscriber status was reported as "Active" at the time of the subpoena return on April 2, 2024. The device has IMEI number 357111206168928 and associated SIM number 8901260235784458612.

48.   These records documented communication between CASTRO and ELIAS's cell phones, on days when the box truck was present at the 12th Street Fire Site, including on June 10, 2023, when the box truck was observed and photographed by the EPA subcontractor.  In particular, T-Mobile records indicate that CASTRO was using, and continues to use, a Samsung Galaxy, associated with phone number 213-924-4420.

49.   ELIAS claimed that he only communicated with CASTRO by phone call and never text message.  However, the call detail records provided by T-Mobile showed ELIAS and CASTRO communicating through text messages as well as phone calls.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

50.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

15

filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

51. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

52. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of

publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

i.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CASTRO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CASTRO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

17

53.  I also know, based on my training and experience, that people typically keep their cellular telephones on or near their persons.

54.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

55.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C § 371 (conspiracy), 42 U.S.C § 6928(d)(2)(A) (treatment, storage, or disposal of a hazardous waste without a permit), and 42 U.S.C § 6928(d)(5) (transportation of a hazardous waste without a manifest) will be found on the subject's person, as described in Attachment A-1 and the SUBJECT DEVICE.

Attested to by the applicant in
accordance with the requirements
Fed. R. Crim. P. 4.1
by telephone on this __ day of
July, 2024


_____
HON. STEVE KIM
UNITED STATES MAGISTRATE JUDGE